Filed 1/15/14  P. v. Merino CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GERMAN M. MERINO JR.,<br><br>    Defendant and Appellant. | B240253<br><br>(Los Angeles County<br>Super. Ct. No. BA361158) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rand S. Rubin, Judge.  Affirmed.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

A jury convicted German Merino, Jr. of special circumstance murder, with true findings on related gang, firearm and dangerous weapon allegations, as well as one count each of making a criminal threat and grand theft. The trial court sentenced Merino to state prison for life without the possibility of parole on the special circumstance murder, plus an additional term of 25 years to life for the personal firearm use enhancement, with additional consecutive terms of 8 months on the criminal threat count and another 7 years on the grand theft count.

Merino appeals, claiming multiple errors. We find all of Merino's claims to be meritless and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

On April 3, 2009, Eddy Munoz, his girlfriend Elizabeth and his brother Carlos Valencia attended a party near 75th and Figueroa in Los Angeles. Munoz drove there in his red Ford Mustang with chrome rims.

Munoz and his brother (Valencia) saw German Merino, Jr. (known to them as "Menace") at the party. Merino was bald and had SDK gang tattoos. SDK stands for "Surenos Do Kill." Merino asked Munoz whether he was "still down with the 'hood.'" Valencia did not know Munoz to be an SDK gang member but had seen him spend time with Merino and other SDK members two or three times a week before Munoz and Valencia moved out of their apartment complex about 18 months earlier. Valencia understood Merino was asking Munoz whether he was still "rolling," meaning active with the gang. Munoz said he was not, explaining he had a little girl and a family.

Merino told Munoz the only way out of the gang was a bullet to the head. Munoz looked to Valencia to be shocked and scared in response to Merino's statement. Merino disappeared for a few minutes, but when he returned, Merino started "mad-dogging" Munoz's group—pacing and giving them a "bad face." Merino gestured to his friends, using his thumb and fingers to simulate a handgun. He told Munoz he had a .45 in his

trunk, and the only way to get out of the gang was a bullet to the head; then Merino told Munoz, because Munoz was his "homie," Merino said: "We're going to jump you out."

At about 11:30 p.m., Merino stopped Munoz, Valencia and Elizabeth when they tried to leave the party. Merino asked Munoz where he was going. When Munoz said he was going home, Merino told him to stay or to promise to come back. Munoz gave his word that he would return. Once they got home, Valencia got out of the Mustang while Munoz and Elizabeth appeared to argue. A few minutes later, Elizabeth left the car crying. Valencia never saw or heard from Munoz again. He and his mother reported Munoz missing two days later. When police interviewed him, Valencia identified Merino in a photographic lineup.

On the morning of April 4, Griselda Sillas was walking down an alley by West 40th Place in Los Angeles. As she passed a rolling gate that was open about 10 inches and looked into the courtyard of the residential property, Sillas could see a bald man struggling to lift a large and apparently heavy black bag into the back of a red car with a horse emblem. Sillas believed she could see the silhouette of legs; the contents of the bag appeared to her to be a body. Sillas also saw a woman, standing about 25 feet from the man. The man was laughing; "[h]e seemed to be having fun."

That evening, Merino telephoned Karla Ramirez who was his girlfriend; she and Merino had a daughter together. Ramirez knew Merino was an SDK gang member known as "Menace." Merino told her he wanted some money he said he had lent her and told her he had some "road kill." When Merino arrived at Ramirez's home in Lancaster, he told Ramirez he had a gift or a surprise. "Kind of giggling," Merino opened the trunk of a red car she had never seen before and showed her a body wrapped in black plastic and yellow tape from thighs to feet. The body was not moving. Ramirez was scared.

Merino then showed Ramirez several credit cards, including a blue Bank of America card with a photograph of a Hispanic male with a moustache on it. Merino grabbed Ramirez by the arm and told her he was taking her shopping. At that point,

3

Ramirez's mother came outside; Merino let go of Ramirez's arm, and she ran inside her house and called the sheriffs. Ramirez could see Merino drinking in the car, and when the sheriffs arrived and tried to approach him, he drove off.

That evening, deputies responded to a report of a vehicle fire in Lancaster. The car was the red 1998 Mustang registered to Munoz. After the fire was extinguished, the car was towed to a secured lot. Upon opening the car's trunk, an arson investigator found a burned male body inside. The body was later identified as Munoz.

The next day (April 5), Merino again telephoned Ramirez, and he was angry. He said Ramirez was a "bitch," and she had betrayed him. He said he was going to kill her and her family. After seeing the body in the trunk, she was scared and remained afraid until Merino was in custody.

Merino also called his mother Miriam that day, telling her he was going to be moving. When she asked if he had done something bad, he started laughing and told her he "killed somebody" and "burn[ed] the car." She said, "You say like that? I don't know you. . . . [Y]ou don't come from me." Merino started laughing again. When she tried to ask more questions, he said he was not going to tell her anything else and hung up.

That same day, Abraham Garcia was at the house Merino shared with his brother Edwin (who was also known as Chico). Garcia was a "close" family friend "for 17 years." Garcia was "like a brother" to Merino and Edwin, and he had known Merino since he was a "little kid." Merino's mother Miriam owned the property located at 1343 West 40th Place in Los Angeles. There was one house on the north side of 40th Place and a second house separated from the front house by a patio or courtyard. Merino and his brother lived in the back house. A fence surrounded the entire property, but there was a rolling gate on the west side between the courtyard area and the alley.

4

When Garcia arrived, only Edwin was there, but Garcia overheard a telephone conversation between Edwin and Merino on the speakerphone.[1] Edwin told Merino he was "acting weird" and asked what he had done. Merino said he had "killed someone." "I slit his throat." Merino was "acting funny" and said he had "painted the room." Garcia and Edwin started "putting two and two together" when they looked into the details and "could see the blood that [Merino] tried to cover . . . ." Garcia urged the police to go to Merino's house because he believed "that's where it took place." Garcia told police Merino said "it was a rival gang member, and he drove him in the car" and "burned the car with the body in it." According to Garcia, Merino "even" described "what he's going to be charged with"—he said it would be "'kidnapping, arson and murder.'"

When Garcia went inside the house, he saw that one of the back bedrooms (previously white) had been partially—"barely half" of the room—painted green. Also, the room was empty, and the bed was missing. Garcia also saw red spots that appeared to be dried blood drops on a TV stand.

On April 7, Los Angeles Police Detective Brian Calicchia served a search warrant on the house Merino and Edwin shared. During the search, Detective Calicchia recovered a spent shell casing at the doorway between the courtyard and west bedroom of the house in the back. When he entered the bedroom, he noticed fresh green paint haphazardly applied to a wall. The wall had not been completely covered, and there was green paint on the carpet. The green paint had not completely covered some red droplets on the wall. The red droplets on the wall and other red droplets found near the TV stand,

---

[1] Garcia described the conversation in a recorded police interview in which he told police he did not want to be involved but wanted to do the right thing. At trial, however, he claimed had had not actually heard the conversation and was only repeating what Edwin had told him.

a shirt and a towel appeared to be consistent with blood, and droplets throughout the room tested positive for blood.[2]

Three days later (on April 10), Merino was detained for jaywalking. A warrant check indicated he was wanted for murder, and he was arrested. Although the arresting officer had only stated that Merino had a warrant and purposely had not otherwise stated the reason for the arrest, Merino spontaneously stated, "Murder's no big deal."

The following day, from jail, Merino called his sister Jacqueline, and their conversation was recorded. Merino admitted he had killed someone and had put the body in the trunk of a car. He also admitted he had threatened Ramirez, telling her he was going to kill her and her parents. Regarding Munoz, Merino told his sister the person he killed was a MS gang member who had been trying to "gun" him—not a friend. Merino said they had a "beef" with MS and people from MS had been looking for him. He said he and his "homies" had been drinking and "caught that fool slipping," meaning he had his guard down. Merino said they brought him back to Merino's "pad" where they beat the man and "did it." He seemingly agreed when Jacqueline said someone else had fired the fatal shot but later said, "It's either me or him. So I took him out." When she asked Merino how he could wrap, drive off with and dispose of the body, Merino said, "Honestly, I didn't even give a fuck." He thought, "Well, this motherfucker's dead. Fuck him. He's a mierda," meaning "piece of shit."

Merino told Jacqueline: "[W]hen I go and do a mission," "I get away with it . . . ." "I took three of these fuckin' fools out already." Unlike those times, Merino said: "This one . . . . It was messy. I didn't even do it smart." He also said he had walked by undercover officers with his gun before his arrest and told his sister he would have "just shot" if they had tried to stop him.

---

[2]     DNA testing then matched the blood to Munoz.

A grand jury indicted Merino on charges of murder (Pen. Code, § 187, subd. (a) [all further undesignated statutory references are to the Penal Code]; count 1), making a criminal threat (§ 422; count 2) and robbery (§ 211; count 3). On count 1, the indictment alleged as a special circumstance that Merino had committed the murder to further the activities of his criminal street gang. As to counts 1 and 3, it was further alleged the crimes were committed for the benefit of, at the direction of or in association with a criminal street gang (§ 186.22, subd. (b)), that a principal personally and intentionally used a firearm (§ 12022.53, subds. (b)-(d)) and Merino personally used a deadly weapon (a knife) (§ 12022, subd. (b)(1)).

At trial, the People presented evidence of the facts summarized above. In addition, a pathologist testified that Munoz had died before his body was burned in the Mustang; he had suffered a fatal gunshot wound to the center of his nose. Before he died from this gunshot wound, Munoz sustained at least four other non-fatal stabbing wounds—one to the side of his face and three to his neck.

Los Angeles Police Officer Guillermo Espinoza testified as a gang expert. He said MS 13 was a large criminal street gang with more than 2000 active members, and the gang had many subsets or cliques, including SDK. Officer Espinoza testified SDK began as a tagging crew, primarily engaged in graffiti and vandalism, but they were recruited or adopted into MS 13 to expand its reach after a gang injunction was issued against MS 13 in 2007. Officer Espinoza said it was his opinion SDK was a subset of MS 13 based on interviews he had conducted with MS SDK gang members, information in arrest reports from a Santa Monica shooting and his own observation of graffiti linking the two gangs. For example, he had seen graffiti of "MS 13" followed by "Sur Do Kill" and an arrow pointing down toward the street.

According to Officer Espinoza's testimony, the primary activities of MS 13 are murder, robbery, kidnapping, extortion, shooting and vandalism. When he was shown certified copies of minute orders indicating Albert and William Ramirez had been jointly

7

convicted of assault with a deadly weapon based on a shooting the two brothers committed on August 21, 2008, Officer Espinoza testified he had contact with William Ramirez on a prior occasion where he "self-admitted his gang affiliation to MS 13, SDK 13 Clique."

Officer Espinoza testified Merino was "an established gang member belonging to MS 13, SDK clique." Officer Espinoza said he had had contact with Merino on two occasions preceding the charged shooting. On the first occasion in March 2008, Merino admitted being part of SDK 13 and said he was known as Mr. Menace. He did not mention MS 13 at that time. In 2009, however, Merino said he was both SDK and MS 13.

Merino had several gang tattoos on his body, including the number 7-3-5 (the keypad numbers corresponding to the letters S-D-K) tattooed on the left side of his face. He also had a teardrop tattooed under his right eye, indicating he had either killed or attempted to kill a rival gang member. He had another SDK tattoo that appeared to be an attempt to cover an "MS" tattoo.

According to Officer Espinoza's testimony, the only way a person could typically leave MS was by getting killed or by suffering a beat down. Given a number of hypotheticals with facts tracking the prosecution's theory of the case, Officer Espinoza testified a homicide in such circumstances was "carried out in furtherance of the gang." Officer Espinoza said it was a sign of disrespect when the victim said he was no longer part of the gang, warranting either a beat down or death. The homicide benefitted the gang by instilling fear and respect while reducing the number of others who would attempt to leave the gang in the future. Further, anyone who participated in the killing would increase his status within the gang as a result of the homicide. In the alternative, Officer Espinoza said, if the victim was a rival gang member, the homicide would also be in furtherance of the gang.

8

Merino testified in his own defense. He admitted he killed Munoz, put Munoz's body in the trunk of Munoz's own red Mustang and then set the car on fire. Merino claimed he initially attacked Munoz to prevent him from sexually assaulting Nadia Garcia who was heavily intoxicated at the time and said he shot Munoz during the fight that followed in an effort to stop, not kill, Munoz.

Merino acknowledged he was an SDK member but said he had socialized with MS members without ever joining that gang. He claimed SDK and MS had become rivals and some MS members had tried to kill him prior to the incident involving Munoz. He did not recall telling police he was a member of MS.

Merino said he knew Munoz well as the two had lived in the same neighborhood and Merino had brought Munoz into SDK, but Munoz had not been around SDK for several years and had not put in any "work." According to Merino, it was not acceptable for a gang member to "disappear" from his fellow gang members. When he saw Munoz at the party on April 3, 2009, Merino told Munoz he needed to be "checked" or beaten up for 19 seconds—one second for each letter of the alphabet through the letter "S—as discipline. According to Merino, Munoz understood the punishment and never said he wanted out of the gang so the conversation was "friendly." He claimed he never said anything about getting a bullet to the head or simulated the handgun gesture with his hand. He said he and Munoz made arrangements to meet later.

After he spoke with Munoz, Merino said he left with a group including Francisco, Buck, Nadia Garcia, Valeria Medina, Kristin Daganpat, Ashley and Amanda. Garcia was 15 and an SDK member. Although he had only known Garcia for less than two months, Merino said he had a special relationship with her and protected her as if she were his younger sister. Because their friendship was so close, Merino testified, Garcia had given Merino a gold Quinceanera ring her grandmother had given her.

According to Merino, when he and his friends left the party, they saw Munoz in his car. He joined them in driving to Merino's house where they all drank beer, smoked

9

marijuana, ate and listened to music.  Merino testified Munoz and Garcia both got very drunk while Merino was in a bedroom with Medina.

When Merino later came out of the bedroom, he said, Munoz was being an obnoxious drunk, annoying Francisco and making unwanted advances toward Daganpat who was sitting on the couch.  Merino said he saw Munoz put his arm around Daganpat and place his hand on her thigh but did not say or do anything.  He (Merino) returned to the bedroom.

Ten minutes later, Merino testified, he heard a female voice screaming for Medina.  He saw Garcia "knocked out" on the couch.  The others decided they wanted to leave and Merino escorted them to the front gate.  When he got back to the house, Merino claimed, he saw Munoz try to grab Garcia and kiss her.  She was "pushing him off to the best of her ability," Merino said.  Merino grabbed Munoz and escorted him outside.  Merino said Munoz struggled against him but was trying to be apologetic.  Munoz just told him to "get the fuck out" and locked the gate with Munoz on the other side.  Merino said he went back inside, only to hear Munoz outside again.  He did the same thing, telling Munoz to "get the fuck out" and locking him outside the property—this time he actually did lock the gates; they were not actually locked before that.  He said he walked up to Munoz and smacked him and kicked him out for the third time.

According to Merino, he then heard a noise and saw Munoz had fallen to the ground by the gate.  Merino was annoyed, he testified, but decided to let Munoz stay.  He and Munoz went into the living room where Garcia was still "knocked out" on the couch.  He left Garcia alone with Munoz and went outside for at least five minutes to smoke a cigarette.  Merino claimed when he got back inside, he saw Munoz on the couch next to Garcia, grabbing her around the waist and trying to pull.  Garcia appeared to be passed out.  Merino said he "snapped"—angry Munoz was trying to take advantage of Garcia.  "[T]hat to me is not acceptable, especially somebody that I care about."

Merino said he punched Munoz, kicked him and dragged him to the bathroom. He slammed Munoz into the toilet area, and then continued dragging him to a bedroom. Merino continued to beat Munoz who did nothing other than struggle to get up. Eventually, Merino said, he stopped the attack and left Munoz on the floor. Merino claimed Munoz then hit Merino on the back of his head. Stunned, Merino said he then grabbed a nearby rifle and tried to use it to shove Munoz away. Merino said he backed up, "tipped over" and fired a shot. He said he had not intended to kill Munoz; he said the shooting was an accident, but also said he fired the shot to stop Munoz and put him down.

Merino testified that after Munoz was shot, he (Munoz) remained standing and started screaming. Merino claimed he panicked and grabbed a machete and attempted to shut him up by swinging the blade at Munoz, hitting him in the face at least twice before he fell to the floor. Merino watched him die.

Merino said he then went to the living room where he drank and smoked until he passed out. In the morning, Merino said, he showed Munoz's body to Garcia. She vomited immediately and left. He said he wrapped Munoz's body in trash bags, retrieved Munoz's Mustang, put Munoz in the trunk and drove to Ramirez's house. He said he showed her Munoz's cards but did not recall showing her Munoz's body. He tried to get Ramirez to take a ride with him, but she went inside and called the police. He drove away when police responded and later set the Mustang on fire. When he got home, he tried to remove any evidence Munoz had been killed there, cleaning and painting the walls with the only paint he had.

When he was arrested, Merino initially told detectives he did not know Munoz. Later, he admitted he knew Munoz, but lied about his death, falsely claiming Munoz was from a rival gang; an SDK member known as "Big Rocky" brought Munoz to Merino's house; Merino joined "Big Rocky" and others in assaulting Munoz; and "Big Rocky" unexpectedly killed Munoz while Merino was in another room. Merino said he made up

11

the name "Big Rocky" and lied about the circumstances to distance himself from Munoz's death.

Merino said he did not tell his brother about killing Munoz in any phone call, denied laughing during the telephone conversation with his mother and said he had lied when he discussed killing Munoz on the phone with his sister Jacqueline.

Similarly, Merino's brother Edwin said Merino made no admissions to him over the telephone; he said the two spoke only briefly, Merino said nothing about killing anyone and he did not use the speakerphone feature at all.

At the time of his death, Munoz's blood alcohol level was .13; there was no indication of any methamphetamine, cocaine, marijuana or other drugs in his system.

In rebuttal, Los Angeles Police Officer Jose Covarrubias testified he and his partner responded to a report of vandalism in progress on Browning Boulevard in Los Angeles on July 20, 2008. Officer Covarrubias saw Merino and another man leave an alley and cross the street so as to require cars to stop to avoid hitting them. In the alley where Merino and the other man had been, Officer Covarrubias saw fresh black graffiti painted on some walls along with several black spray paint cans. Among the gang markings on the walls, the fresh graffiti said "MS," "MS 13," and "MS X 13." When he was told he was being arrested for vandalism, Merino said he was from MS and he had written it all. He had "MS 13" tattooed on his body at the time.

In addition, Detective Calicchia testified that when he interviewed Merino on April 10, 2009, he saw no wound to the back of Merino's head or any other injury.

Defense investigator Alice Villalobos testified she interviewed Garcia, but she never said she had seen Munoz's body. She said she had vomited in the morning because of the excessive amount of alcohol she had consumed.

Further, when Villalobos interviewed Medina, she said nothing about Munoz making any attempt to "hit on" Daganpat.

12

The jury found Merino guilty as charged on counts 1 (special circumstance murder) and 2 (terrorist threats). On count 3 (robbery), the jury found Merino guilty of the lesser included offense of grand theft, also with a true finding on the gang allegation. The trial court sentenced Merino to state prison for life without the possibility of parole for the special circumstance murder, plus an additional term of 25 years to life for the firearm enhancement. (§ 12022.53, subd. (d).) The trial court sentenced Merino to an additional and consecutive state prison terms of 8 months on the terrorist threat count and another 7 years on the grand theft count.

Merino appeals.

### *DISCUSSION*

**We Reject Merino's Claim of Prejudicial Error in the Trial Court's Conduct of Voir Dire.**

Citing isolated excerpts from the reporter's transcript, Merino says reversal is required because the trial court had an "unduly limited understanding of what it meant to be fair and impartial" so "there is a significant likelihood that prospective jurors did not disclose their biases." After reviewing the transcript in its entirety, we disagree.

The trial court informed the prospective jurors of the charges, the parties, potential witnesses and their responsibilities as potential jurors. In its preliminary remarks, the trial court stressed and repeatedly reiterated the importance of having jurors who would be fair and impartial and who would decide the case solely on the evidence presented at trial and "not based on anything you think outside this building."

The trial court inquired whether any of the prospective jurors anticipated any difficulty in being fair and impartial, followed up with anyone so indicating and allowed counsel to inquire further.

Juror P8514, an attorney, said he did not think he could be fair because of his exposure to gang violence, the fact his wife had lived in a very bad neighborhood and because one of his closest friends was a police officer who would discuss his work in a

13

gang unit. The trial court inquired further, emphasizing the juror's obligation to consider only the evidence presented and to follow the law and to decide the case without regard to other circumstances. When the juror began to describe problems with gangs, the trial court interjected, "The bottom line is that's not this case," and continued on. This prospective juror (among others) was excused by stipulation.

Juror B1191 said a childhood friend of his was murdered in 2004, and he (Juror B1191) had served as a juror on an attempted murder trial in 2006. He said the nature of the case before the court was "uncomfortable" for him and brought "it all back." Merino claims impropriety in the trial court's statement that: "The bottom line is, if the People don't prove it beyond a reasonable doubt, Mr. Merino deserves a not guilty verdict. . . . It's not, [']the People didn't prove it beyond a reasonable doubt but . . . my friend was murdered in 2004, so guilty.'" Asked whether he would do his very best to evaluate the case based on the evidence alone, the prospective juror said he was "going to give it a shot." He said he knew the law required a fair trial and he had to be open-minded. Defense counsel used a peremptory challenge on Juror B1191.

At sidebar, Juror C5908 disclosed that he had been stabbed during a carjacking in 1980 and said he did not know how he would judge the case. The trial court noted Merino had not been involved in the prior crime and that crime should not be held against him. The juror agreed, indicating he would "try to be fair" and would do his best and would be able to vote not guilty if the prosecution did not prove the charges beyond a reasonable doubt. In response to defense counsel's questioning, he said he thought he could properly fulfill his obligations as a juror. Defense counsel used a peremptory challenge to excuse Juror C5908.

Juror M2451 said she had been robbed by gang members, her brother had been beaten by gang members, and she had seen other crimes committed by gang members, and all of these experiences affected her perception of them. Merino faults the trial court's following statement (in the context of clarifying statements the prospective juror

14

had made and indicating the expectation that the juror would vote guilty if the People's evidence proved the defendant guilty beyond a reasonable doubt of the charges against him, and not guilty if the evidence did not prove guilt beyond a reasonable doubt): "Do not say, well, maybe there's not enough evidence, but I have these perceptions about gang members so I'm going to vote guilty anyway. I mean, is that what you're telling us you might do if there's not enough evidence? . . . So the bottom line is, in your heart of hearts you know if you're going to be able to evaluate the evidence or not." She responded, "I do have certain biases, but I'll do my best." When defense counsel questioned her further, she said she had not made up her mind about the case and was willing to sit back and listen to the evidence. She said she was open to considering the testimony, whether it came from a gang member or a police officer. Defense counsel exercised another peremptory challenge to this juror.

"Trial courts possess broad discretion over both '[d]ecisions concerning the qualifications of prospective jurors to serve' and the manner of conducting voir dire." (*People v. Whalen* (2013) 56 Cal.4th 1, 29, internal citations omitted.)

Notably, Merino does not assert the trial court erred in failing to exclude any prospective juror who was biased. Because he did not exhaust his peremptory challenges, such a challenge would be barred. (See *People v. Taylor* (2010) 48 Cal.4th 574, 606.) Instead, Merino speculates that other prospective jurors were improperly influenced not to disclose their own biases because the trial court's view of bias was "grossly underinclusive" such that reversal is required.

Actual bias is "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of the party." (Code Civ. Proc., § 225, subd. (b)(1)(C).) Where a juror gives conflicting responses, however, a trial court may "reasonably conclude the juror was trying to be honest in admitting his preconceptions but was also sincerely willing and able to listen to the evidence and

15

instructions and render and impartial verdict based on that evidence and those instructions." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488.) "An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial." (*People v. Nesler* (1997) 16 Cal.4th 561, 581.) As our Supreme Court has observed, a juror irrevocably committed to the abolition of the death penalty could still subordinate his personal views to his perceived duty to abide by his oath as juror. (*People v. Whalen, supra,* 56 Cal.4th at p. 30.)

Having reviewed the entire transcript, we find Merino's speculative challenge to the trial court's conduct of voir dire to be meritless. The trial court repeatedly and clearly stated the prospective jurors' obligations, explored any indications of potential biases, allowed counsel's further questioning of prospective jurors as counsel saw fit and indeed, not all available peremptory challenges were used. A criminal defendant is entitled to an impartial jury, but the "Constitution does not indicate a catechism for voir dire." (*People v. Cleveland* (2004) 32 Cal.4th 704, 737.) "Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire was conducted is not a basis for reversal." (*People v. Holt* (1997) 15 Cal.4th 619, 661.)

**We Reject Merino's Claim Reversal Is Required as to Counts 1 and 3 Because the Trial Court Did Not Allow the Defense to Present Evidence Nadia Garcia Had Told Merino She Had Been Molested in the Past.**

Merino claims his testimony that Nadia Garcia confided in him that she had been molested in the past was the "most compelling aspect of their relationship" of only a month to six weeks and explained why a reasonable person with this knowledge would have been provoked to react violently as he did when he said he saw Munoz grab (an intoxicated) Garcia around the waist, "trying to pull." Therefore, he says, the trial court prejudicially erred in excluding such evidence. We disagree.

16

A trial court has broad discretion to exclude relevant evidence if its probative value is substantially outweighed by the probability its admission will necessitate the undue consumption of time or create substantial danger of undue prejudice, of confusing the issues or of misleading the jury. (Evid. Code, § 352; *People v. Riccardi* (2012) 54 Cal.4th 758, 808-809.) Discretion is abused only when the trial court's ruling falls "outside the bounds of reason." (*People v. Alexander* (2010) 49 Cal.4th 846, 912-913.)

Here, Merino did testify to a special and close relationship with Garcia such that he treated her like a younger sister. He said the two were so close that she gave him the gold ring her grandmother had given her for her quinceanera. He testified to a relationship of a nature that he would have reacted in the same way whether she had been molested in the past or not; in fact, defense counsel apparently conceded as much. In this context, he was not deprived of the right to present a defense in violation of the constitution, and he has not shown an abuse of discretion. (*People v. Alexander, supra,* 49 Cal.4th at pp. 912-913.)

Moreover, Merino claimed he had killed Munoz because he had to stop him from sexually assaulting Garcia for the first time at trial. According to the record, he laughed as he forced Munoz's body into the trunk of Munoz's own car, when he showed Munoz's body to Ramirez, describing it as "roadkill" and when he told his mother what he had done. He never said anything about Munoz attempting to assault Garcia. His conversation with his sister described an entirely different context for the killing; he was only sorry that he had been messy in this case, unlike when he killed the three other "fuckin' fools." When an officer approached him at the time of his arrest, he said, "Murder's no big deal." The jury was entitled to find that his story at the time of trial was inconsistent and unbelievable. For example, he testified he had been hit on the back of the head so hard he was dazed and stunned, but his testimony was contradicted by testimony indicating he had no sign of any injury the week after the killing. Notably, the jury found the gang allegation true, meaning they rejected the defense claim Munoz had

17

been preventing a sexual assault (prior molestation or not). Munoz cannot establish prejudice in any event. (See *People v. Cain* (1995) 10 Cal.4th 1, 45.)

**Merino Has Failed to Demonstrate Prejudicial Error Based on the Trial Court's Understanding of the Hearsay Rule.**

According to Merino, the trial court lacked a basic understanding of the hearsay rule. Although he does not identify prejudice as to any one statement in particular, he says errors interrupted the flow of the evidence presentation and added to the prejudice flowing from the exclusion of further testimony about Garcia's alleged prior molestation—a claim we have already rejected.

Nevertheless, we examine Merino's claims of evidentiary error. First, he says the trial court refused to allow him to testify to the specific content of his conversations with Munoz at the party which he says was not offered to prove the truth of the matters asserted in the conversation but rather to show the friendly nature of the conversation and to rebut the prosecution's claim Munoz was fearful or concerned. Similarly, he says, he denied he ever told Munoz he "had better return to the party (as prosecution witness Carlos Valencia had testified)," but the trial court refused to let him testify to what the conversation actually involved. Even assuming the trial court erred in rejecting Merino's claim he offered such testimony for a non-hearsay purpose, Merino cannot demonstrate prejudice in the exclusion of this testimony. As he necessarily concedes, the trial court did allow him to testify that the "tenor" of the conversation was "friendly" and does not explain what more would have been gained had more detail been elicited, or that the trial court was not entitled to find such added detail cumulative and properly excluded pursuant to Evidence Code section 352.

Next, Merino complains that when he testified he heard a female screaming a name while he was in the bedroom with Valerie, the trial court erroneously agreed with the prosecutor that the name called out was hearsay. However, the trial court overruled the prosecutor's objection based on the hearsay exception for excited utterances.

18

Therefore, he was able to present the testimony and was not prejudiced by a misapplication of the hearsay rule.

Merino also says the trial court erroneously struck as hearsay his testimony that when Munoz returned to Merino's house after being turned away the first time, Munoz said he wanted to "kick it" which he says would have shown Munoz was not afraid of Merino. Even assuming the trial court erred in excluding Merino's testimony Munoz said he wanted to "kick it" (or anything else he said that Merino claimed prompted him to allow Munoz to stay), the jury nevertheless did receive Merino's testimony claiming that he had to forcibly remove Munoz from his home three times because he kept coming back, supporting Merino's claim Munoz was not afraid of him and necessarily defeating his claim of any resulting prejudice.

Merino says the trial court improperly excluded certain testimony from Medina that her friend (Daganpat) complained about Munoz which he says would have shown Merino's non-gang-related purpose in his interactions with Munoz, but Medina did expressly testify that she left the party with her friends because Munoz was hitting on Daganpat like an obnoxious drunk. Again, it follows that the ruling of which he complains did not prejudice Merino.

Finally, he says he was not allowed to testify that when he spoke to Garcia in the morning after Munoz was killed, he told her to leave, but fails to identify the probative value of the excluded testimony and once again has failed to demonstrate prejudice as a result of the ruling. Because Merino has failed to demonstrate prejudice in any of these separate instances as well as the fact the jury rejected his version of events, we reject his claim based on the aggregation of these rulings as well. (See *People v. Geier* (2007) 41 Cal.4th 555, 582; *People v. Cain, supra,* 10 Cal.4th at p. 45.)

19

**We Find No Prejudicial Error in Detective Calicchia's Testimony Regarding the Recorded Witness Statements.**

In Merino's view, Detective Calicchia was permitted to vouch for the "facts and the truth" of the prosecution's recorded statements when he testified that it was his experience that if witnesses know they are being recorded, "a lot of times witnesses will not be as forthcoming with the information because they fear that there is being a record taken and they may be called to testify and they are generally more forthcoming and provide more complete disclosure. You have facts and the truth when they do not know they're being recorded." We disagree.

Our Supreme Court has rejected such a claim to generalized testimony like that presented through Detective Calicchia although it "invariably" supports the credibility of another witness. (*People v. Ward* (2005) 36 Cal.4th 186, 210-211.) Moreover, the testimony to which he objects, including his mother's testimony about his laughing it telling her what he had done, was cumulative of other evidence to which he has no objection. Further, he and his sister Jacqueline were repeatedly informed throughout their own conversation when he called her from jail that "calls may be recorded," and he specifically said to her, "You do know they're recording the fuckin' conversation, right?" She said, "I know that." Yet, he continued speaking. Merino has failed to demonstrate prejudicial error.

**Merino Was Not Prejudiced by the Prosecutor's Closing Argument.**

Merino says the trial court improperly allowed the prosecutor to dilute the reasonable doubt standard. We disagree.

Again, carving out a piece of the prosecutor's closing argument, Merino claims the prosecutor misstated the reasonable doubt standard. Having reviewed the argument, it was not only consistent with the circumstantial evidence presented and the applicable law (*People v. Stewart* (2004) 33 Cal.4th 425, 508), but the jurors were properly instructed with CALCRIM No. 225, and we presume the jurors followed the court's instructions.

Meanwhile, the evidence of Merino's guilt was overwhelming. We find no error, and no prejudice in any event. (*People v. Thornton* (2007) 41 Cal.4th 391, 441.)

**The "Primary Activities" Evidence Underlying the Gang Enhancements Was Not Improper.**

According to Merino, reversal is required because the jury was given an improper theory on which to find the "primary activities" element of the gang allegations true (because evidence of MS 13 activities does not suffice as evidence of SDK and vice versa). We disagree.

Merino ignores the fact that, three months before he killed Munoz, Merino admitted he was both SDK and MS 13, consistent with Officer Espinoza's testimony Merino was an established member of MS 13, SDK clique and that SDK had become a clique or subset of MS 13 in 2007; graffiti also evidenced the link between these two identified gangs. Consequently, Merino's argument the primary activities evidence was insufficient necessarily fails by his own admissions.

Given our resolution of the preceding arguments, it follows that Merino's ineffective assistance of counsel and cumulative error claims necessarily fail as well.

### DISPOSITION

The judgment is affirmed.

WOODS, Acting P. J.

**We concur:**

ZELON, J.                                                    SEGAL, J.[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.